**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA FLORES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 C 6571 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| UNITED AIRLINES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

While using defendant's website to purchase a ticket for air travel, plaintiff Patricia Flores ("Flores") was offered the option to purchase travel insurance, and she accepted. When plaintiff learned defendant United Airlines ("United") would receive a cut of the money she paid for insurance, Flores brought this suit, asserting claims for violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act and the RICO ("Racketeer Influenced and Corrupt Practices Act") statute, as well as a claim for unjust enrichment.[1] United moves to dismiss. For the reasons set forth below, the Court grants the motion.

---

[1] The Court has federal-question jurisdiction over plaintiff's RICO claims and supplemental jurisdiction over her state-law claims. 28 U.S.C. § 1331. Plaintiff has also alleged that the Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Plaintiff has alleged that there are "thousands" of class members (Complt. ¶ 61) and that the amount in controversy exceeds $5,000,000.00 (Complt. ¶ 9). Named plaintiff Flores is a citizen of Texas (Complt. ¶ 7), and defendant is a citizen of Delaware (its state of incorporation) and Illinois (the location of its principal place of business) (Complt. ¶ 8). Thus, at least one plaintiff is "a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).

## I.   BACKGROUND

The following facts are from plaintiff's complaint, and the Court takes them as true.

On its website, United sells tickets for the air transportation it provides.  After a customer such as plaintiff has chosen a flight but before she has purchased it, United offers the customer the option to purchase travel insurance.

United's customers are not required to purchase travel insurance in order to purchase a ticket to fly, but they are required either to accept or reject the option of travel insurance.  Under the heading "**United Travel Options**," the website says, "Cover your trip with Travel Guard ® insurance[.]"  (Am. Complt. ¶¶ 24-25).  Below that, the website reads:

> Don't miss out!  Plan includes:
> --Flight refund if you can't travel for covered illness
> -- Coverage for lost baggage including laptops, phones and cameras

(Am. Complt. ¶ 27).  A customer then has two options from which to choose: (1) "Yes, insure my trip for only $[price;]" or (2) "No, I will travel without insurance for my [ticket price] trip." Below the two options, the website says, "Coverage is offered by Travel Guard Group, Inc." (Am. Complt. ¶ 33).

Plaintiff, for her part, purchased a travel insurance policy from United's website on February 23, 2018.  She does not say how much she paid.  She later "received an email from the insurance provider attaching her policy, which did not reference United."  (Am. Complt. ¶ 51). Plaintiff alleges that "[w]hen United sends a receipt, it states that the cost of the trip insurance is remitted to Travel Guard Group, Inc."  (Am. Complt. ¶ 33).  Specifically, plaintiff alleges the receipt "lists the specific amount charged for 'Trip insurance' and states it will be 'Billed separately by Travel Guard Group, Inc."  (Am. Complt. ¶ 36).  Plaintiff does not allege that she received such a receipt.

At no point during plaintiff's transaction to purchase travel insurance did United disclose to her that it had a financial interest in her purchase of travel insurance, but it did. Plaintiff alleges "United retains or ultimately receives for itself a portion of the funds for every trip insurance policy its customers purchase on its website." The portion United receives is described by plaintiff variously as: a kickback, a commission, an illegal commission and a hidden profit center. (Am. Complt. ¶¶ 41, 43 & 44). According to plaintiff's complaint, "United has also concealed and/or failed to disclose to state regulators the fact that it receives a commission or kickback every time a customer elects to purchase a travel insurance product through its website." (Am. Complt. ¶ 41).

Plaintiff alleges that the price of the travel insurance "is set by the insurer, not United." (Am. Complt. ¶ 48). Plaintiff alleges that neither the dates of travel nor the route affects the insurance price. She alleges the price for each travel insurance policy purchased on United's website is "based solely on the overall ticket price." (Am. Complt. ¶ 45). Plaintiff also alleges that "[b]ecause the price of travel insurance . . . incorporates an illegal commission paid to United," customers pay an inflated price. (Am. Complt. ¶ 46).

## II.     STANDARD ON A MOTION TO DISMISS

The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6).[2] Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v.*

---

[2] In her response brief, plaintiff put most of her citations to case authority in footnotes, making reading her brief unnecessarily difficult and violating the spirit of the page limit. The parties are warned that, in the future, the Court will ignore any citations that the parties put in footnotes.

*Gibson*, 355 U.S. 41, 47 (1957)).  A complaint need not provide detailed factual allegations, but mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice.  *Twombly*, 550 U.S. at 555.  To survive a motion to dismiss, a claim must be plausible. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Allegations that are as consistent with lawful conduct as they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

In considering a motion to dismiss, the Court accepts as true the factual allegations in the complaint and draws permissible inferences in favor of the plaintiff.  *Boucher v. Finance Syst. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018).  Conclusory allegations "are not entitled to be assumed true," nor are legal conclusions.  *Iqbal*, 556 U.S. at 680 & 681 (noting that a "legal conclusion" was "not entitled to the assumption of truth[;]" and rejecting, as conclusory, allegations that "'petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement").  The notice-pleading rule "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-679.

Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, the "circumstances constituting fraud" must be alleged with particularity.  Fed.R.Civ.P. 9(b).

## III.    DISCUSSION

### A.      Plaintiff's claim for consumer fraud

In Count I, plaintiff asserts that defendant violated the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1 et seq.  To state a claim, plaintiff must allege:  "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct

involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 180 (Ill. 2005). "Recovery may be had for unfair as well as deceptive conduct." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417 (Ill. 2002).

### 1.    Transactions outside Illinois

Defendant argues that plaintiff cannot pursue her claim under the ICFA, because the ICFA does not apply "to fraudulent transactions which take place outside Illinois." *Avery v. State Farm Auto. Ins. Co.*, 216 Ill.2d 100, 185 (Ill. 2005). In *Avery*, the Illinois Supreme Court explained that "a fraudulent transaction may be said to take place within a state if the circumstances relating to the transaction occur primarily and substantially within that state." *Avery*, 216 Ill.2d at 186. There, the Illinois Supreme Court concluded "the out-of-state plaintiffs in this case have no cognizable cause of action under the Consumer Fraud Act." *Avery*, 216 Ill.2d at 188.

Here, plaintiff alleges that she is a resident of Texas. She does not say whether she was in Texas or elsewhere when she used United's website to purchase travel insurance. She does not say whether she ever made a claim under the travel-insurance policy or, if so, where she was when she made a claim. She does not say what travel itinerary the travel insurance was meant to protect.

Instead, in her complaint, plaintiff alleges that United is headquartered in Illinois and that the "United employees responsible for the presentation and operation of the ticketing process on United.com work in Illinois." (Am Complt. ¶ 16). The facts that a defendant is headquartered in Illinois, that the fraudulent scheme emanated from Illinois and/or that a website was designed in Illinois, however, do not suffice to establish that a transaction occurred primarily and

substantially in Illinois. *Avery*, 216 Ill.2d at 189 ("The appellate court's conclusion that a

scheme to defraud was 'disseminated' from [defendant's Illinois] headquarters is insufficient.");

*Robinson v. DeVry Education Group, Inc.*, Case No. 16 CV 7447, 2018 WL 828050 at *4 (N.D.

Ill. Feb. 12, 2018) (dismissing ICFA claim where defendant was headquartered in Illinois and

"operate[d] its website in Illinois, where it published misrepresentations," because "the

administration of defendant's business in Illinois is insufficient to give a nonresident plaintiff a

claim under Illinois statutes."); *Sgouros v. Transunion Corp.*, Case No. 14 C 1850, 2016 WL

4398032 at *5 (N.D. Ill. Aug. 18, 2016) (rejecting claim that website transaction with company

headquartered in Illinois occurred primarily and substantially in Illinois, because that was

"outweighed by Plaintiff's residence in Missouri, his search for and purchase of Defendants'

product in Missouri and his attempt to benefit from that product to acquire an auto loan in

Missouri"); *Bagg v. HighBeam Research, Inc.*, Case No. No. 12 C 9756, 2013 WL 3466846 at

*5 (N.D. Ill. July 10, 2013) ("[E]ven if the Court assumes [defendant's] website is designed in

Illinois and the alleged deceptive conduct was disseminated to Plaintiffs from Illinois, this is

insufficient for the purposes of ICFA."); *Haught v. Motorola Mobility, Inc.*, Case No. 12 C 2515,

2012 WL 3643831 at *4 (N.D. Ill. Aug. 23, 2012) (rejecting plaintiff's attempt "to distinguish

the instant case by emphasizing that the alleged misrepresentations were designed in Illinois and

disseminated on a website registered and hosted in Illinois"). Thus, plaintiff has not plausibly

alleged the transaction occurred primarily and substantially in Illinois.

  In her brief, plaintiff argues that the terms of service on United's website state that

disputes arising out of the use of the website are governed by Illinois law. Plaintiff does not

include any such allegations in her complaint, so the Court will not consider this argument.

Plaintiff invites the Court to take judicial notice of the contents of United's website, but the

contents of a website, which can be changed in mere minutes, are not an appropriate subject for judicial notice. Fed.R.Civ.P. 201(b) ("The Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

Plaintiff has not alleged that the transaction occurred primarily and substantially in Illinois. Accordingly, she has not stated a claim under the Illinois Consumer Fraud and Deceptive Trade Practices Act. That is not her claim's only deficiency.

### 2. Unfair practice

Next, defendant argues that plaintiff has not plausibly alleged an unfair practice within the meaning of the ICFA. In "determining whether a given course of conduct or act is unfair," courts must consider three factors: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers." *Robinson*, 201 Ill.2d at 417-18. The Illinois Supreme Court has concluded that a plaintiff need not establish all three. Rather, "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson*, 201 Ill.2d at 418 (quoting *Cheshire Mortgage Service, Inc. v. Montes*, 612 A.2d 1130, 1143-44 (Conn. 1992)).

### a. Public policy

Plaintiff first argues that United's practice of taking a commission violates Illinois public policy. Plaintiff cites an Illinois statute, which states:

> A person may not accept a commission, service fee, brokerage, or other valuable consideration for selling, soliciting, or negotiating insurance in this State if that person is required to be licensed under this Article and is not so licensed.

7

215 ILCS 5/500-80(a). Plaintiff, however, has not alleged that United is required to be licensed, let alone alleged it plausibly. Nor has plaintiff plausibly alleged that United "solicit[ed]" insurance under that statute. The statute defines "solicit" as "attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company." 215 ILCS 5/500-10. Plaintiff has not alleged United did so.[3]

Thus, plaintiff has not plausibly alleged that the commission is against public policy.

### b.      Immoral, unethical, oppressive or unscrupulous

Plaintiff has also failed to allege plausibly that the undisclosed commission is immoral, unethical, oppressive or unscrupulous.

Plaintiff often refers to the commissions as kickbacks, but that does not make it so. As the Seventh Circuit has explained:

> [S]imply calling the commission a kickback doesn't make it one. [Under] traditional understanding of a kickback: an agent, charged with acting for the benefit of a principal, accepts something of value from a third party in return for steering the principal's business to the third party. The defining characteristic of a kickback is divided loyalties.

---

[3] The Court agrees with defendant that "solicit[ing]" under the statute must mean more than "offering or disseminating," which the statute defines separately to include, among other things:

> (1) Providing information to a prospective or current policyholder on behalf of a limited lines travel insurance entity, including brochures, buyer guides, descriptions of coverage, and price. . . . (4) Collecting premiums from a prospective or current policyholder on behalf of a limited lines travel insurance entity.

215 ILCS 5/500-108(a). Defendant also relies on this portion of the statute in arguing that its conduct falls within ICFA's safe-harbor provision for "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 ILCS 505/10b(1). The safe-harbor provision, however, provides an affirmative defense, *Keith v. Ferring Pharmaceuticals, Inc.*, Case No. 15 C 10381, 2016 WL 5391224 at *11 (N.D. Ill. Sept. 27, 2016), around which plaintiff need not plead, *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir. 2014).

*Cohen v. American Sec. Ins. Co.*, 735 F.3d 601, 611 (7th Cir. 2013); *see also Balderos v. City Chevrolet*, 214 F.3d 849, 853 (7th Cir. 2000) ("The plaintiff describes the dealer's [undisclosed] cut [of a finance charge] as a 'kickback' from the finance company[.] . . . But an automobile dealer is not its customers' agent, obviously not in selling cars but only a little less obviously in arranging financing. If the buyer pays cash and arranges his own financing, the dealer is not in the picture at all. If the buyer wants to buy on credit, he recognizes that his decision does not change the arms' length nature of his relation to the dealer. He knows, or at least has no reason to doubt, that the dealer seeks a profit on the financing as well as on the underlying sale."). Plaintiff has not alleged that United, as the seller of air travel, was plaintiff's agent. Likewise, plaintiff has not alleged she engaged United to find her travel insurance. United was acting on its own behalf when it sold air travel on its website, and it was acting on its own behalf when it allowed travel insurance to be offered on its website. The commissions were not kickbacks.

Furthermore, commissions are not inherently immoral, unethical, oppressive or unscrupulous. Every day in this country, individuals engage in transactions that involve commissions. Often, when a person sells a house, a real estate agent earns a commission. Often, when a person buys a car or a company buys supplies, the salesperson earns a commission. Often, when a person buys clothing at a store, such as Nordstrom, the salesperson earns a commission. Plaintiff seems to think the lack of disclosure makes the commission somehow nefarious, but the Court does not see how. Nordstrom does not post at its counters signs warning customers that its sales staff earns commission on sales, yet the Court is not aware of any cases holding that such practices constitute fraud or are unfair to customers. A wise consumer assumes a salesperson in a store is working on commission and that the owner of a website gets a share of the sale of products sold on its website. *Cf. Balderos*, 214 F.3d at 853 ("If the buyer wants to

buy [a car] on credit, he . . . knows, or at least has no reason to doubt, that the dealer seeks a profit on the financing as well as on the underlying sale."). United's offering a service for which it would receive an undisclosed commission was not immoral, unethical, oppressive or unscrupulous.

That is so, because plaintiff, for her part, could take it or leave it. She took it. She has not alleged she was forced to take it. *See, e.g., Robinson*, 201 Ill.2d at 420 ("Plaintiffs do not allege in their complaint that they were coerced into signing the leases because of dire alternatives threatened by [defendant]."); *Ekl v. Knecht*, 223 Ill.App.3d 234 (2nd Dist. 1991) (plumber's threat to undo his work and turn off plaintiff's water unless he was paid immediately was coercive and oppressive). To the contrary, plaintiff alleges she had a choice either to purchase travel insurance or not to purchase travel insurance. She alleges (and thus admits) that she could have declined the travel insurance. (Am. Complt. ¶ 30). Offering a choice to a potential customer is not immoral, unethical, oppressive or unscrupulous, which is to say offering a choice is not unfair for purposes of the ICFA. *See Toulon v. Continental Casualty Co.*, 877 F.3d 725, 741 (7th Cir 2017) ("If [plaintiff] did not want to buy the Policy, she could have looked elsewhere to determine if other companies were selling long-term care policies [with different terms]. Because [plaintiff] was in no way forced to buy the Policy, 'there was a total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness[.]'") (quoting *Cohen*, 735 F.3d at 609); *Anthony v. Country Life Mfg., LLC*, 70 Fed. Appx. 379, 382 (7th Cir. 2003) ("[Plaintiff] had the opportunity to compare the ingredients of the Lo Carb and Lo Carb 2 bars with various other nutritional bars and in no way suffered a lack of meaningful choice necessary to establish unfairness.").

Plaintiff also argues that she paid more for the travel insurance due to the commission. That might be true, but it does not matter. Whether the commission was passed on to the buyer of the insurance or paid for by the insurance company depends on the elasticity of demand. *See, e.g., Paper Systems, Inc. v. Nippon Paper Industries Co., Ltd.*, 281 F.3d 629, 633 (7th Cir. 2002) ("How much of any overcharge is passed on depends on the elasticities of supply and demand in the chain of distribution, which are exquisitely hard to pin down."); *Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 257-58 (7th Cir. 1998) ("A tax lowers the demand for coal, and its burden is distributed according to the elasticity of demand. The district court supposed that demand for coal is perfectly inelastic, and if so buyers bear the whole tax and sellers are unaffected. If demand is not perfectly elastic, then the sellers bear some of the loss[.]") (internal citations omitted). The only price the consumer cares about is the total price. *See Buck v. American Airlines, Inc.*, 476 F.3d 29, 36 (1st Cir. 2007) ("It is freshman-year economics that higher prices mean lower demand, and that consumers are sensitive to the full price that they must pay, not just the portion of the price that will stay in the seller's coffers."). The total price was a price plaintiff was willing to pay for travel insurance, as evidenced by her allegation that she paid it. (Am. Complt. ¶ 51). There is nothing immoral, oppressive, unscrupulous or unethical about charging a consumer a price she is willing to pay. *See Batson v. Live Nation Entertainment, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[Plaintiff] contends that he was not informed of the existence of the [$9 parking fee] until *after* he purchased his nonrefundable ticket. . . . What we know is that [plaintiff] was willing to pay the face price in order to see [the concert]. He may be trying to argue that he paid an overcharge in the amount of $9, but there is nothing in this record to indicate that there was anything oppressive about the full price."). Furthermore, as the Illinois

Supreme Court has said, even "charging an unconscionably high price generally is insufficient to establish a claim for unfairness." *Robinson*, 201 Ill.2d at 418.

In short, plaintiff has not plausibly alleged a practice that was immoral, unethical, oppressive, or unscrupulous.

### c.      Substantial injury

Finally, the Court agrees with defendant that plaintiff has not alleged a substantial injury. Where, as here, a plaintiff could have avoided the harm by purchasing a different policy (or not purchasing it at all), she has not suffered a *substantial* injury. *Toulon*, 877 F.3d at 741 ("[Plaintiff] cannot establish a substantial injury because she could have avoided the harm by purchasing a different long-term care insurance policy from another company.").

### 3.      Injury

The Court also agrees with defendant that plaintiff has not alleged an injury for purposes of the ICFA. Plaintiff has alleged she purchased travel insurance, and she alleges she received the travel insurance. So long as she received the benefit of the bargain, she was not injured. *See Kim v. Carter's Inc.*, 598 F.3d 362, 365-66 (7th Cir. 2010) ("The plaintiffs agreed to pay a certain price for [defendant's] clothing . . . the plaintiffs in this case got the benefit of the bargain and suffered no actual pecuniary harm. It follows that the plaintiffs' allegations fail to state a claim under the ICFA."); *Anthony*, 70 Fed. Appx. at 383 ("because [plaintiff] consumed the products, she received exactly what she paid for and therefore did not suffer economic injury.").[4]

---

[4]      Plaintiff seems to think she received nothing of value from United in exchange for the commission United received, but that is not plausible. If plaintiff searched other places for travel insurance and still chose the policy on United's website, then a reasonable inference would be that the policy she purchased was better in some respect. Perhaps it was cheaper. Perhaps it offered protection for a broader range of reasons for canceling travel. If, on the other hand,

For all of these reasons, plaintiff has failed to state a claim under the ICFA. Accordingly, defendant's motion to dismiss is granted as to Count I.

### 4. Preemption

The above-noted flaws in plaintiff's ICFA claim may be curable, but defendant also argues that the claim is preempted by the Airline Deregulation Act.

The Airline Deregulation Act prohibits "the States from enforcing any law 'relating to rates, routes, or services' of any air carrier." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378-79 (1992) (quoting 42 U.S.C.App. § 1305(a)(1)). The term "relating" is read broadly, such that laws "having a connection with or reference to airline 'rates, routes, or services' are preempted under 49 U.S.C.App. § 1305(a)(1)." *Trans World Airlines*, 504 U.S. at 384. Thus, restrictions on airline advertising are preempted, because they affect, and thus relate to, airline rates. *Trans World Airlines*, 504 U.S. at 388-89 (citing *Illinois Corporate Travel v. American Airlines, Inc.*, 889 F.2d 751, 754 (7th Cir. 1989)). Similarly, state-law claims regarding frequent-flier programs are preempted as relating to airline rates "because the program awards mileage credits that can be redeemed for tickets and upgrades." *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 284 (2014). Claims relating to airline services are also preempted, such that claims relating to the provision of air transportation, as well as "ticketing, boarding procedures, provision of food and drink, and baggage handling" are preempted. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1433 (7th Cir. 1996).

---

plaintiff did not search for competing travel insurance policies before purchasing the one on United's website, then the reasonable inference is she received something of value: the saving of time and search costs. In any case, she received an insurance policy at a price she was willing to pay.

Defendant argues plaintiff's claim relates to ticketing and airline rates, but the Court disagrees. Plaintiff's claim relates not to airline rates but to rates for *travel insurance*, which plaintiff alleges was provided by a third party (Am. Complt. ¶ 22) and which United's website described as being "offered by Travel Guard Group, Inc." (Am. Complt ¶ 31). Thus, the claim does not relate to a service provided by United. *See Dolan v. JetBlue Airways Corp.*, 385 F. Supp.3d 1338, 1345-46 (S.D. Fla. 2019). Defendant argues that plaintiff's claim relates to airline rates in that the travel insurance covers change fees under certain circumstances. The Court does not agree that claims regarding the sale of travel insurance on defendant's website relates to the rates defendant charges for air travel. Plaintiff has not, for example, alleged that United gives a discount on air travel to customers who purchase insurance. Nor does United argue that it waives change fees for travelers who purchase travel insurance. Rather, the purpose of the travel insurance seems to be that, in the event of a covered loss, the third-party travel insurer refunds to the traveler the ticket price or change fee. The rates United charges are unaffected, so plaintiff's claim does not relate to airline rates. Accordingly, Count I is not preempted by the Airline Deregulation Act.

For all of these reasons, the Court dismisses Count I without prejudice.

**B. Unjust enrichment**

In Count IV, plaintiff seeks relief for unjust enrichment. In that claim, too, plaintiff alleges that United was unjustly enriched when plaintiff purchased travel insurance.

The Seventh Circuit has held that, where a party fails to state a claim under the ICFA, she necessarily fails to state a claim for unjust enrichment. *Toulon*, 877 F.3d at 741-42 ("We agree with the district court that [plaintiff] failed to state a claim for unjust enrichment because she

failed to state a claim for fraud or for violation of the ICFA.").  Thus, the Court also dismisses Count IV without prejudice.

### C.    RICO

#### 1.    Failure to state a claim

In Count II, plaintiff asserts that defendant violated the Racketeer Influenced and Corrupt Practices (RICO) Act, 18 U.S.C. § 1962(c), by making false statements in email messages and on a website in furtherance of a scheme to "deceiv[e] Plaintiff . . . into believing that when they purchased a travel insurance policy on Defendant's website, the price displayed represented the cost of the policy."  (Am. Complt. ¶ 100).  In Count III, plaintiff asserts conspiracy under 18 U.S.C. § 1962(d).  Defendant moves to dismiss for failure to state a claim, among other reasons.

RICO provides a private right of action for violations of 18 U.S.C. § 1962.  18 U.S.C. § 1964(c).  In passing the RICO statute, Congress sought "to eradicate organized, long-term criminal activity."  *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992). "RICO has not federalized every common-law state cause of action" despite "widespread abuse of civil RICO."  *Midwest Grinding*, 976 F.2d at 1025.  The Seventh Circuit has explained:

> The prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetuate more, and less easily discovered, criminal acts than he could do in his own person, that is, without channeling his criminal activities through the enterprise that he has taken over.

*Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997).  RICO has particular pleading (and proof) requirements, because RICO is not meant to be "'a surrogate for garden-variety fraud actions properly brought under state law.'"  *Menzies v. Seyfarth Shaw LLP*, __ F.3d __, __, 2019 WL 5884481 at *5 (7th Cir. Nov. 12, 2019) (quoting *Midwest Grinding*, 976 F.2d at 1022).

Plaintiff asserts a violation of 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate directly in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To state a claim, plaintiff must plausibly allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Menzies*, __ F.3d at __, 2019 WL 5884481 at *4.

A "pattern of racketeering activity" is defined in the statute as "at least two acts of racketeering activity [within a specified time period]." 18 U.S.C. § 1961(5). Racketeering activity includes many indictable offenses, including mail and wire fraud and laundering of monetary instruments. 18 U.S.C. § 1961(1). Wire (or mail) fraud requires allegations of a scheme to defraud, intent to defraud and use of wires (or mail) in furtherance of the scheme. *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). Allegations of mail or wire fraud, of course, must comply with Rule 9(b), which "requires a plaintiff to provide 'precision and some measure of substantiation' to each fraud allegation, i.e., "a plaintiff must plead the 'who, want, when, where, and how' of the alleged fraud." *Menzies*, __ F.3d at __, 2019 WL at 5884481 *6.

Plaintiff asserts that she has alleged a pattern of wire fraud. The Court disagrees. As an example of wire fraud, plaintiff points to her allegation that United and "insurers" have "failed to disclose receipt of these unlawful commissions . . . [to] Illinois state insurance regulators." (Am. Complt. ¶ 53). Plaintiff does not allege when, where, how or what was said in these alleged wire communications. Thus, this allegation does not comply with Rule 9(b).

Next, plaintiff points to her allegations of a few instances of communication between United and plaintiff, only one of which instances complies with Rule 9(b). Plaintiff alleges that after a purchase, United "sends a ticket receipt" that notes the charge will be "Billed separately by Travel Guard Group, Inc." (Am. Complt. ¶ 35-36). Plaintiff does not allege when or if she received such a receipt, so this allegation does not comply with Rule 9(b). In addition, plaintiff does not allege that this was a misstatement. She does not, for example, allege that, in fact, someone other than Travel Guard Group, Inc. billed her for the travel insurance. Next, plaintiff alleges that the insurer emailed a copy of the insurance policy. (Am. Complt. ¶ 37). She does not allege the date when she received this communication, so it, too, fails to comply with Rule 9(b). In addition, plaintiff does not allege any misstatements in the communication; she merely alleges that the communication did not make "any reference to United['s] receiving any payment in connection with the transaction." (Am. Complt. ¶ 37). Finally, plaintiff alleges that, on February 23, 2018, plaintiff purchased travel insurance on United's website. (Am. Complt. ¶ 37). She also alleges that the website stated "Coverage is offered by Travel Guard Group, Inc." (Am. Complt. ¶ 31). This statement is alleged with particularity, but it is not alleged to be a misstatement. Instead, plaintiff alleges the website did not disclose United's "financial interest in the sale of travel insurance[.]" (Am. Complt. ¶ 34).

The big problem with plaintiff's claim is that she fails to allege a scheme to defraud. Plaintiff does not allege a single misstatement, misleading statement or half-truth. She merely alleges an omission: that United did not disclose its financial interest in the transaction. Plaintiff cites *Emery v. American General Finance, Inc.*, 71 F.3d 1343 (7th Cir. 1995) for the proposition that an omission, even absent a duty to disclose, can constitute mail fraud.

Plaintiff overreads *Emery*, where the Seventh Circuit explained:

The language of the mail-fraud statute is very broad, and concern has repeatedly been expressed that it not be given too vague and encompassing a scope by judicial interpretation. . . .

Consistent with this concern, recent cases, at least, make clear that all the statute punishes is *deliberate* fraud, where in order to get money or something else of monetizable value from someone you make a statement to him that you know to be false, or a half-truth that you know to be misleading, expecting him to act upon it to your benefit and his detriment. We emphasize the 'half-truth' of this definition. *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985) holds that 'omissions or concealment of material information can constitute fraud . . . cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation.' In that case a laboratory had omitted from a report on the toxicity of a drug an opinion by a consultant that the drug had some toxic effects, and we held that the jury was entitled to find that this omission was fraudulent, given the impression, conveyed by the report, of the utter harmlessness of the drug. Plenty of cases say that 'merely failure to disclose' is not, without more, mail fraud [citation omitted], and we certainly have no quarrel with this proposition. Whether a failure to disclose is fraudulent depends on context[.]

*Emery*, 71 F.3d at 1346-47 (internal citations omitted). *Emery*, thus, does not stand for the

proposition that an omission alone is mail fraud but rather that a half-truth or an omission in the

context of concealment can be mail fraud. The Seventh Circuit has since confirmed, "[i]n short,

the federal mail and wire fraud statutes reach a seller's or buyer's deliberate misrepresentation of

facts or false promises that are likely to affect the decisions of a party on the other side of the

deal." *Weimert*, 819 F.3d at 357. A scheme to defraud requires proof of "a material false

statement, misrepresentation or promise, or concealed material fact." *Weimert*, 819 F.3d at 355.

The Seventh Circuit has warned, "[w]e must take care not to stretch the long arms of the

fraud statutes too far." *Weimert*, 819 F.3d at 356. Plaintiff's claim would stretch the fraud

statutes too far. There is nothing inherently nefarious about a travel insurer, in this case Travel

Guard, wanting to offer its travel-insurance policies to a captive audience of individuals who are

in the middle of purchasing an airline ticket on United's website. Nor is there anything nefarious

about United's wanting to be compensated for providing that captive audience or about Travel

Guard's paying to obtain access to the captive audience. Such overhead costs do not a RICO fraud claim make, even if the costs of doing business are undisclosed. *See Ezell v. Lexington Ins. Co.*, 926 F.3d 48 (1st Cir. 2019) (Souter, J.); *Perino v. Mercury Finance Co. of Ill.*, 912 F. Supp. 313, 316 (N.D. Ill. 1995) ("Defendant's conduct [in keeping part of the difference between the finance company's charge and the amount charged to the customer] is neither fraudulent nor is it an illegal 'kickback.' . . . Repeated allegations of 'secret agreements' and 'kickbacks' do not transform this perfectly legal conduct into actionable fraud under RICO.").

In *Ezell*, the First Circuit affirmed dismissal of a RICO claim based on a failure to disclose a commission on an annuity policy. *Ezell v. Lexington Ins. Co.*, 926 F.3d 48 (2019). The First Circuit explained that the "commission . . . was included in the price" and that there was "no basis to infer" an obligation to disclose such "overhead" costs. *Ezell*, 926 F.3d at 51. Nor did the failure to disclose the commission "belie the fact[]" that plaintiff received what was promised. *Ezell*, 926 F.3d at 51. The First Circuit concluded that plaintiff had failed to allege "any circumstances constituting fraud." *Ezell*, 926 F.3d at 51.

Just so here. Plaintiff has alleged she received the travel policy she paid for and includes no allegations suggesting an obligation to disclose a commission. Plaintiff has not, for example, alleged United was her agent, such that an undisclosed commission might breach a fiduciary duty. *See Balderos*, 214 F.3d at 853 (dealer's undisclosed share of finance charge did not support RICO claim, because lack of allegation of agency relationship meant dealer did not breach fiduciary duty). Nor has she alleged a context that suggests concealment. A wise consumer assumes United would profit from an arrangement allowing outside services to be sold on its website. *Cf. Balderos*, 214 F.3d at 853 ("If the buyer wants to buy [a car] on credit, he recognizes that his decision does not change the arms' length nature of his relation to the dealer.

19

He knows, or at least has no reason to doubt, that the dealer seeks a profit on the financing as well as on the underlying sale.").

Plaintiff has alleged no false statement or material representation. She has not alleged a context suggestive of fraud. Instead, she has alleged she purchased a travel insurance policy at a rate that was disclosed to her (a rate which was obviously acceptable to her, as evidenced by the fact that she agreed to pay it), and she has alleged she received the policy. (Am. Complt. ¶¶ 29, 51). That is not fraud. Accordingly, plaintiff has not alleged a single instance of wire fraud.

Wire fraud is not the only type of racketeering activity plaintiff attempts to allege. Plaintiff also argues that she has alleged money laundering under 18 U.S.C. § 1556. "A money-laundering violation under either § 1956 or § 1957 requires proof of two distinct acts: the unlawful activity that generated 'proceeds' and then the monetary transaction conducted with the criminal proceeds. *United States v. Kelerchian*, 937 F.3d 895, 908 (7th Cir. 2019). Wire fraud can be that underlying unlawful activity. *Id*. The problem with plaintiff's argument, though, is that her allegations of money laundering assume she has plead an underlying act of wire fraud, which, as explained above, she has not.

Plaintiff's RICO claim has other flaws,[5] but these are enough. Plaintiff has failed to state a claim under § 1962(c) in Count II. It follows that plaintiff has also failed to state a claim for

---

[5] For example, even if each of the instances of communication between plaintiff and United had been alleged with particularity and had constituted wire fraud, they still would not constitute a *pattern* of racketeering activity. Two instances of racketeering are necessary but not sufficient, and plaintiff has alleged only generally that the same thing happened to other people. *Menzies*, 2019 WL 5884481at *9 ("The plaintiff needed to come forward, not with general statements about what others may have received, but with particular allegations detailing the content of the communications with others allegedly defrauded by the defendant's conduct. Without those alleged facts there was no way to conclude that the plaintiff had advanced with particularity the predicate acts of mail or wire fraud against anyone other than himself. . . . Without such allegations, we have no way to determine whether multiple predicate acts of mail or wire fraud occurred in a manner that satisfies RICO's pattern requirement.") (internal citations omitted). In

conspiracy under § 1962(d) in Count III. *United Food and Commercial Workers Unions and Employers Midwest Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856-57 (7th Cir. 2013) ("Having failed to plead facts that would establish a violation of Section 1962(c), the [plaintiff] cannot state a claim for conspiracy under Section 1962(d) based on those same facts."); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998) ("We have stressed that the touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed would constitute a violation of the substantive statute.").

### 2.    McCarran-Ferguson Act

Defendant also argues that plaintiff's claims under RICO are barred by the McCarran-Ferguson Act. Congress passed the McCarran Act "to allow the states to regulate the business of insurance 'free from inadvertent preemption by federal statutes of general applicability.'" *Autry v. Northwest Premium Services, Inc.*, 144 F.3d 1037, 1040 (7th Cir. 1998) (quoting *Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co.*, 50 F.3d 1486, 1488-89 (9th Cir. 1995)). As the McCarran Act itself states, "regulation and taxation by the several States of the business of insurance is in the public interest" and "silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S.C. § 1011.

Pursuant to the McCarran Act, "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. §

---

addition, one is hard pressed to decipher in plaintiff's complaint an enterprise apart from two companies in a contractual relationship hoping to make money out of the contract. *See Green v. Morningstar Investment Mgt. LLC*, Case No. 17 C 5652, 2019 WL 216538 at *3 (N.D. Ill. Jan. 16, 2019) ("[T]wo or more companies conducting their own businesses and then working together to make money does not run afoul of RICO.").

1012(b).  The Supreme Court has stated that to invalidate means "to render ineffective" and that to supersede means "to displace."  *Humana, Inc. v. Forsyth*, 525 U.S. 299, 307 (1999).  To "impair" for purposes of the McCarran Act means to "frustrate any declared state policy" or "interfere with a State's administrative regime."  *Humana*, 525 U.S. at 310; *see also Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 563 (7th Cir. 1999) ("Direct conflict with state law is not required to trigger this prohibition; it is enough if the interpretation would 'interfere with a State's administrative regime.'") (quoting *Humana*, 525 U.S. at 310).

In *Mutual of Omaha*, the Seventh Circuit considered whether a claim based on a provision of the Americans with Disabilities Act, as interpreted by plaintiff, was barred by the McCarran Act and explained:

> The interpretation . . . for which the plaintiffs contend would [interfere with a State's administrative regime.]  State regulation of insurance is comprehensive and includes rates and coverage issues, so if federal courts are now to determine whether caps on disabling conditions (by no means limited to AIDS) are actuarially sound and consistent with principles of state law they will be stepping on the toes of state insurance commissioners.

*Mutual of Omaha*, 179 F.3d at 563-64 (internal citations omitted).

Plaintiff's RICO claims interfere with Illinois's administrative regime for insurance in a few respects.  First, plaintiff seeks to use an asserted violation of an Illinois insurance regulation as a predicate act.  Specifically, plaintiff alleges that "[u]nder state insurance regulations, United's co-conspirators must report to the state a list of agents" and that "United's co-conspirators made material misrepresentations in their reports to and filings with state agencies by failing to disclose the amount of insurance risk they receive from United."  (Am. Complt. ¶¶ 112-13).  Plaintiff's claims would interfere with Illinois's insurance administrative scheme by requiring the Court to determine whether a third party's insurance filings complied with state insurance regulations.  *See Mutual of Omaha*, 179 F.3d at 564 ("Even if the formal criteria are

the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with *state* law—obviously would interfere with the administration of state law.").

Next, plaintiff's claims assert that, in violation of RICO, plaintiff has paid too high a premium for her travel insurance. Specifically, plaintiff alleges the rate she paid was too high, because it "incorporate[d] an illegal commission paid to United, as opposed solely to underwriting risk and insurer profit[.]" (Am. Complt. ¶ 46). Plaintiff would have this Court opine as to whether the rate she paid for insurance was too high and what overhead was appropriately included in the rate for her travel insurance. Such consideration of the appropriateness of the rate for an insurance policy "step[s] on the toes of state insurance commissioners" because "[s]tate regulation of insurance is comprehensive and includes rates and coverage issues." *Mutual of Omaha*, 179 F.3d at 564; *see also Camarena v. Safeway Ins. Co.*, Case No. 00 C 5826, 2002 WL 472245 at *7 (N.D. Ill. March 27, 2002) (holding that a discrimination claim was barred by the McCarran Act and explaining "the court would have to examine the rates defendant charges for coverage . . . and compare those figures to those charged by 'standard' insurers. In making the comparison, the court would necessarily have to take into consideration all of the factors that influence insurance rates[.]"). In short, rates are a matter for state regulators. This Court is not meant to oversee their work. *See Ludwick v. Harbinger Group, Inc.*, 854 F.3d 400, 405 (7th Cir. 2017) ("[A]s a practical matter, a federal court ruling on the specific things [plaintiff] alleges against this particular [defendant] would mean asking the same questions as state insurance regulators ask and effectively double-checking their work. In other words, such review is just the sort of case-specific intrusion and interference we have held the McCarran-Ferguson Act forbids.").

Finally, as defendant points out, an Illinois statute regulates the circumstances under which a "travel retailer" may "offer[] and disseminat[e] travel insurance on behalf of and under the license of a supervising travel insurance business entity." 215 ILCS 5/500-218. Plaintiff's interpretation of RICO (as requiring travel companies such as United to make particular statements about commissions or payments it receives when a customer purchases travel insurance on its website) interferes with this administrative scheme. The Illinois statute is plainly one that regulates the business of insurance, and RICO is not a statute that specifically relates to the business of insurance, *Humana*, 525 U.S. at 306. Thus, plaintiff's RICO claims are barred by the McCarran Act.

Accordingly, defendant's motion to dismiss plaintiff's RICO Counts II and III is granted, and Counts II and III are dismissed with prejudice.

## IV.     CONCLUSION

For the reasons set forth above, the Court grants defendant's motion [27] to dismiss. The Court dismisses Counts I and IV without prejudice. The Court dismisses Counts II and III with prejudice. Defendant's motion [36] to strike class allegations is denied as moot. Plaintiff is granted 35 days in which to file an amended complaint, should she so choose.

**SO ORDERED.**                                    **ENTERED: December 10, 2019**

_____
**HON. JORGE ALONSO**
**United States District Judge**